UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                                          :
BRANDON HOLMES,                           :          03 Civ. 3426 (RJH) (RLE)
                                          :
                    Plaintiff,            :          **<u>MEMORANDUM OPINION</u>**
                                          :              **<u>AND ORDER</u>**
          -against-                       :
                                          :
CORRECTION OFFICER J. GRANT et al.,       :
                                          :
                    Defendants.           :
                                          :
--------------------------------------------------------------x


          Plaintiff Brandon Holmes, currently incarcerated in Southport Correctional

Facility ("Southport"), brings a *pro se* complaint under 42 U.S.C. § 1983 (2000), seeking

monetary damages and declaratory and injunctive relief against defendants James Grant

et al., corrections officers, staff, and prison superintendents of the New York State

Department of Correctional Services ("DOCS"), alleging violation of his constitutional

rights.  According to a liberal reading of plaintiff's *pro se* pleadings, plaintiff alleges

denial of due process, cruel and unusual punishment, malicious prosecution, and

retaliation.  Defendants William Kivett, A. Baker, J. Smith, Brian Sweeney, Daniel

Connolly, Matt Mullin, Kenneth Colao, James Grant, J. Decklbaum, David Miller,

Superintendent Eisensmidt, Officer McCreery, and William P. Scott have filed a motion

to dismiss all claims or, in the alternative, to transfer any claims not dismissed to the

Northern District of New York.  On October 25, 2005, Magistrate Judge Ronald L. Ellis

issued a Report and Recommendation (the "Report") recommending that this Court grant

defendants' motion to dismiss all of plaintiff's claims.

Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), this Court is required to undertake a *de novo* review of those portions of the Report to which specific written objections have been made. The Court, in its discretion, may also undertake a *de novo* review of the entire case. *See Pine Run Properties v. Pine Run Ltd.*, 1991 WL 280719, at *7 (S.D.N.Y. Dec. 26, 1991). Due to the complexity of the action and the number of claims being brought by plaintiff, the Court elects to review the entire case *de novo*. For reasons to be explained below, defendants' motion to dismiss is granted in part and denied in part.[1]

## BACKGROUND

Plaintiff has set forth extensive factual allegations in his complaint, which the Court shall accept as true for the purposes of this 12(b)(6) motion. In addition, both parties have submitted a number of exhibits. The Court takes judicial notice of those exhibits that constitute public records. Fed. R. Evid. 201; *see also Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002).

1.    The July 2000 Shawangunk Hearing

Plaintiff's lengthy story begins on June 29, 2000. While confined at the Shawangunk Correctional Facility ("Shawangunk"), plaintiff was involved in a fight with several correction officers and was administratively charged with, *inter alia*, an assault on

---

[1] The Report also recommended the dismissal of plaintiff's claims for excessive force and for conspiracy. On the face of the complaint, plaintiff is not bringing either an excessive force claim and or a § 1983 conspiracy claim. Even if plaintiff's complaint was liberally interpreted to be attempting to state a conspiracy claim, he has not made any nonconclusory allegations establishing that there was an *agreement* between multiple state actors to deprive him of his civil rights. *See Brewster v. Nassau County*, 349 F. Supp. 2d 540, 547 (citing *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983)) (noting that in order to make out a conspiracy claim, plaintiff must allege (1) an agreement between two or more state actors or between a state actor and a private entity (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal, and causing some harm); *see also Walter v. Jastremski*, 430 F.3d 560, 564 n.5 (2d Cir. 2005) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002)) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983 . . . .").

six of them, including defendants Ryan, Bertone, Kivett, and McCreery. (Amend. Compl. ¶¶ 20, 70.) A disciplinary hearing was scheduled to commence on July 5, 2000. (*Id.* ¶ 21.)

From June 29 to the conclusion of the hearing on July 21, plaintiff was held in the Shawangunk Special Housing Unit ("SHU"). (*Id.* ¶ 46.) On June 29, defendant Connolly ordered that plaintiff be placed in "mechanical restraint," consisting of handcuffs and leg irons, whenever he left his cell, and be placed on exercise deprivation, resulting in plaintiff being confined to his cell for twenty-four hours a day. (*Id.* ¶¶ 23, 63.) In these June 29 orders, Connolly concluded that plaintiff "assault[ed] . . . staff resulting in injuries to 2 sergeants and 3 officers." (*Id.* ¶ 23; Pl.'s Aff., Ex. 1.) These orders remained in effect until approximately July 11. (Amend. Compl. ¶ 23.)

The hearing began on July 5, with Connolly acting as hearing officer. (*Id.* ¶ 21.) Plaintiff objected to Connolly acting as the hearing officer, since he was the same official who had ordered plaintiff's restraints and exercise deprivation and was allegedly predisposed against plaintiff. (*Id.* ¶ 24.) Connolly declined to recuse himself. (*Id.*) Plaintiff alleges that Connolly conducted the hearing in a biased and unfair manner and introduced evidence after the close of the hearing that was used to support his determination of plaintiff's guilt. (*Id.* ¶¶ 25, 42.) Plaintiff also alleges that Connolly "distorted" his mother's testimony (*id.* ¶ 27); did not properly weigh the fact that photos of plaintiff, showing his alleged injuries, were of poor quality (*id.* ¶ 28); and refused to acknowledge a defense of justification (*id.* ¶ 29). Plaintiff further alleges that Connolly refused to allow plaintiff assistance from a prison counselor for a surprise witness that

Connolly called (*id.* ¶ 36) and refused to allow plaintiff to call any witnesses, claiming that they would be redundant (*id.* ¶¶ 38, 44).

Because he was confined in the SHU, plaintiff was unable to marshal evidence for his defense. Plaintiff was assisted in his preparations for the hearing by Correction Counselor Chapperino. (*Id.* ¶ 31) According to plaintiff, however, Chapperino provided little to no assistance. Chapperino, *inter alia*, refused to retrieve documents for plaintiff, claiming that they were irrelevant (*id.*) and not only did not interview witnesses on plaintiff's behalf but actively pressured and threatened witnesses not to testify (*id.* ¶ 33).

Plaintiff was ultimately found guilty at the hearing on July 21 and sentenced to five years in the SHU, a $99 restitution fee, and loss of miscellaneous privileges. (*Id.* ¶ 41.)

2.    Shawangunk SHU Confinement from June through August 2000

In the SHU, inmates are confined to their cells for twenty-three to twenty-four hours of the day. (*Id.* ¶ 62.) Plaintiff alleges that SHU confinement is also noisy, unhygienic, and inmates throw feces as weapons. (*Id.*) SHU places a number of substantial restrictions on inmate privileges, including, *inter alia*, visitation with family being conducted behind plexiglass instead of "full-contact" visitation, limited exercise and rehabilitation opportunities, and the denial of televisions, radios and the like. (*Id.* ¶¶ 64–69.)

Plaintiff, first confined to the Shawangunk SHU on June 29 pending the Shawangunk hearing, continued to be confined there following its verdict. (*Id.* ¶ 46.) SHU prisoners are normally given some privileges if they successfully complete thirty days of "good behavior," but plaintiff alleges that Connolly falsified his records to deny

him these privileges. (*Id.* ¶ 45.) Frustrated by this, plaintiff, by his own admission, received two inmate misbehavior reports ("IMRs") for incidents on August 10 and August 15. (*Id.* ¶ 45; Defs.' Aff. Ex. A, at 5.) Plaintiff was sentenced to thirty days of SHU confinement and thirty days of "keeplock" confinement as a result of these two IMRs.[2] (Defs.' Aff. Ex. A, at 5.) Plaintiff does not deny the bad conduct underlying these two IMRs or claim that the subsequent disciplinary hearings for these IMRs denied him due process.

On August 30, plaintiff was transferred briefly to the Downstate Correctional Facility ("Downstate") before being transferred to Southport's SHU. (*Id.* ¶ 46.) At Southport, plaintiff was under a "restraint" order, and forced to wear handcuffs and waist chains, including during exercise periods. (*Id.* ¶¶ 48–49.)

3.    The August 2000 Shawangunk IMRs

On September 18, 2000, the sentence arising out of the June 29 Shawangunk incident was reversed and a new hearing was ordered on the grounds that the hearing officer, Connolly, had been involved in "pre-hearing assessment" of plaintiff when he issued the restraint and exercise deprivation orders. (*Id.* ¶¶ 117–18; Pl.'s Aff., Ex. 5.) Plaintiff, however continued to be confined in Southport SHU, to begin serving the sentences received for the two August IMRs. (Amend. Compl. ¶ 48; Defs.' Aff. Ex. A, at 5.)

Plaintiff was transferred to the Eastern Correctional Facility ("Eastern") SHU on September 25. (Amend. Compl. ¶ 52.) Plaintiff continued to be confined at Eastern until he was transferred on November 1. (*Id.* ¶ 61.) Between November 1 and November 7,

---

[2] Plaintiff uses the term "keeplock" to refer to conditions where inmates are confined for twenty-three hours a day in a general population housing unit cell. (Amend. Compl. ¶ 149.)

plaintiff was confined for some time at both Downstate and Southport. (*Id.* ¶¶ 61, 119.) Sometime during the first week of November, DOCS officials decided not to hold a second administrative hearing against plaintiff for the June 29 Shawangunk incident. (*Id.* ¶ 119)

On November 7, 2000, plaintiff was transferred to the Sing Sing Correctional Facility ("Sing Sing"). (*Id.* ¶ 120.) Plaintiff alleges that he was supposed to be released into the general population but was instead kept under keeplock status. (*Id.* ¶ 121.) Prison records show, however, that this keeplock time was the remainder of the sentence that plaintiff was serving for the August IMRs. (Defs.' Aff. Ex. A, at 5.) Plaintiff complained to a corrections officer and filed a grievance through the DOCS inmate grievance program protesting his keeplock status. (*Id.* ¶ 125.) On November 17, plaintiff was released from keeplock confinement. (*Id.* ¶ 126.) At a grievance hearing, plaintiff claims he was told that he had "pissed somebody off" and that that was the cause for his confinement. (*Id.* ¶ 127.) [3]

4.    The Twenty-Four Hour Lighting in Eastern SHU

As noted, plaintiff was confined in the Eastern SHU between September 25 and October 31, 2000. (*Id.* ¶ 53.) The Eastern SHU has a policy of leaving cell lights on twenty-four hours a day. (*Id.* ¶ 54.) Plaintiff alleges that he could not sleep and suffered injury as a result of this policy, including fatigue, loss of appetite, migraine headaches, and a "violent aggravation of rashes." (*Id.* ¶ 55.) Plaintiff sought medical treatment for his conditions on October 10. (*Id.* ¶ 56.) Plaintiff complained to correction officers and

---

[3] Plaintiff was sentenced to thirty days SHU time and thirty days keeplock time as a result of the August IMRs. As indicated here, he actually spent more than thirty days in the SHU, from September 18 through October 31. Part of this SHU time was administrative confinement because he had to testify in front of the grand jury for his criminal assault charges. (*See* Amend. Compl. ¶ 104.)

filed administrative grievances through the DOCS Inmate Grievance Program ("IGP"); the prison superintendent, defendant Miller; and the DOCS Central Office Review Committee ("CORC"), but his requests to have the lights turned off were denied. (*Id.* ¶¶ 54, 61; Pl. Aff., Ex. 8.) These conditions continued for thirty-five days until plaintiff was transferred on November 1, 2000. (Amend. Compl. ¶ 61.)

5.      The Defendants' Filing of Criminal Assault Charges

On July 8, 2000, the six officers involved in the June 29, 2000 incident at Shawangunk filed a felony complaint for charges of assault in the second degree against plaintiff in Ulster County. (*Id.* ¶ 70; Pl. Aff., Ex. 5(b).) On August 15, 2000, plaintiff was arraigned on six counts of assault in the second degree. (Amend. Compl. ¶ 98.) In October 2000, the six officers testified before the grand jury. (*Id.* ¶¶ 99, 109.) Plaintiff alleges that defendants Kivett and McCreery perjured themselves before the grand jury. (*Id.* ¶¶ 71, 99, 111.) Plaintiff does not allege that defendants Ryan and Bertone committed perjury. (*See id.* ¶ 109.) Plaintiff chose to testify before the grand jury on October 12 and October 19, 2000; he was forced to do so while wearing mechanical restraints. (*Id.* ¶ 107.) The grand jury indicted plaintiff for the Ryan and Bertone assaults but dismissed the other four charges of assault. (*Id.* ¶ 100.) Plaintiff alleges that the grand jury was not properly instructed on self-defense and that, had they been so instructed, he would not have been indicted on any counts. (*Id.* ¶ 110.)

6.      The December 2000 Sing Sing IMR for Mess Hall Violations

On December 17, 2000, defendant Deckelbaum filed an IMR against plaintiff for loss/damage of property, failing to have an identification card, mess hall violations, and impersonation. (*Id.* ¶ 130.) Plaintiff alleges that this IMR was a false accusation. (*Id.*)

Plaintiff admits that he did not have his identification card and acknowledges that he had an extra food ration but maintains that he received it from his neighbor. (*Id.* ¶¶ 127, 134.) On December 22, plaintiff was sentenced to "counsel and reprimand," with no disciplinary sentence, for this IMR. (*Id.* ¶ 132.) Sometime within the week, Deckelbaum warned plaintiff that next time he would not be so "lucky" and that he would "get [his]." (*Id.* ¶ 133.) Plaintiff alleges that he filed a grievance about Deckelbaum in December but that the grievance was never processed. (*Id.* ¶ 135.)

7.      The March 2001 Sing Sing IMR

On March 1, 2001, plaintiff was involved in a fight with another inmate named LaFontaine and charged with an IMR (the "Sing Sing IMR"). (*Id.* ¶ 138.) Plaintiff maintains that this was a one-on-one fight but that defendant Grant exaggerated the IMR filed against him, accusing him of "double-teaming" LaFontaine with another inmate. (*Id.* ¶ 139.) Plaintiff alleges that he asked Grant why he had falsified the IMR, to which Grant replied that plaintiff "pissed some real serious people off." (*Id.* ¶ 142.) At a hearing held on March 7, plaintiff pled guilty to fighting but maintained that he did so one-on-one. (*Id.* ¶ 140.) The hearing official, defendant Colao, found plaintiff guilty of both fighting and the "double-team" assault and sentenced plaintiff to a ninety-day keeplock sentence and the loss of nine months of "good time" credit. (*Id.* ¶¶ 146–47.) Plaintiff alleges that Colao made off-the-record remarks that plaintiff liked "knocking staff around," purportedly in reference to the June 29, 2000 Shawangunk incident. (*Id.* ¶ 148.)

8.    The March 2001 Conversion of Plaintiff's Keeplock Sentence to SHU Confinement

On March 19, 2001, plaintiff was transferred from the keeplock sentence he was serving at Shawangunk to the Upstate SHU. (*Id.* ¶¶ 144, 149.) Plaintiff alleges that his sentence of keeplock confinement was changed to harsher SHU confinement out of retaliation. (*Id.* ¶¶ 149–52.) At Upstate, plaintiff was confined in his cell with another prisoner for twenty-four hours a day (*Id.* ¶ 149), presumably until he was again transferred on May 17.

Upon his arrival at Upstate, defendant Kivett allegedly came up to plaintiff, asked him how he "beat the ticket" as to the June 2000 Shawangunk incident, and threatened him. (*Id.* ¶¶ 72–73.) Plaintiff's property was held for eight days following plaintiff's transfer to Upstate and, when ultimately returned to plaintiff, was covered in pancake syrup. (*Id.* ¶ 74.) Plaintiff alleges that correction officials implied that this was in retaliation for assaulting Kivett. (*Id.*) Plaintiff states further that, on April 30, 2001, prison officials gave him his meal without the standard veal ration, again in retaliation. (*Id.* ¶¶ 76–77.) Plaintiff alleges that he filed a grievance with the IGP about the food and syrup incidents, linking the two as continued retaliation, but that it was never received by the grievance committee. (*Id.* ¶ 78.)

9.    The May 2001 Five Points IMR

On either May 11 or 17, 2001,[4] plaintiff was transferred to the Five Points Correctional Facility ("Five Points"). (*Id.* ¶¶ 80, 156.) On May 18, 2001, plaintiff was charged with fighting, again with LaFontaine (the "Five Points IMR"). (*Id.* ¶ 158.) Plaintiff alleges that defendant Sweeney approached him, ostensibly to investigate the

---

[4] The date differs in two different paragraphs of the complaint.

allegations, but instead warned plaintiff that he would "get all of [his] time owed here." (*Id.* ¶¶ 159–60.) At the hearing, held on May 21, plaintiff pled not guilty to all charges and intimated that he was the victim of a "set-up." (*Id.* ¶ 162.) Read liberally, plaintiff's complaint alleges that he never fought with LaFontaine the second time at all and that defendants fabricated the charge. (*Id.*) The hearing officer, defendant Rich, did not allow plaintiff to call witnesses or present evidence. (*Id.* ¶ 163.) On May 25, plaintiff was found not guilty of fighting LaFontaine but found guilty of violent conduct. (*Id.* ¶ 164.) Plaintiff was sentenced to ninety-day SHU confinement and the loss of ninety days of "good time" credit. (*Id.* ¶ 166.)

Plaintiff alleges that he served nearly sixty days in the SHU as a result of this incident, although it is not clear from the face of the complaint when this SHU sentence began or ended and how much of that time was administrative confinement and how much of it was punitive. (*Id.*) The results of the May 25 hearing were reversed and expunged on July 13, 2001. (*Id.*)

10.    Denial of Access to Courts

Upon his sentencing for the Five Points IMR, plaintiff requested to return to his general population cell in order to separate his legal material from his cellmate's property. (*Id.* ¶ 170.) Defendant Mullen told plaintiff that he could not return to his cell for any purpose whatsoever. (*Id.* ¶ 171.) As a result, plaintiff's trial transcript for his original murder conviction was lost. (*Id.* ¶ 172.) Plaintiff alleges that he exhausted his grievances as to this matter and filed a complaint with Inmate Claims. (*Id.* ¶ 173.) The trial transcript was never located. (*Id.*)

On June 18, 2001, plaintiff began his trial for the Ryan and Bertone assaults stemming from the June 2000 Shawangunk incident. (*Id.* ¶ 80.) Defendant Kivett testified against plaintiff at his trial. (*Id.*) Plaintiff was acquitted of all charges. (*Id.*)

On July 11, 2001, plaintiff was transferred back to Upstate. (*Id.* ¶ 81.) Plaintiff alleges Kivett came up to plaintiff, said that "you beat us again" in reference to plaintiff's successful defense against the assault charges, and intimated there would be further retaliation. (*Id.* ¶ 82.) On July 14, when plaintiff went to receive his property that had been shipped to him from his previous prison, he noticed that some of his legal material was missing. (*Id.* ¶ 83.) Plaintiff therefore refused to sign the prison property inventory forms. (*Id.*) Plaintiff alleges that the same correction officer who was involved in the missing food incident in April 2001 told him that this was "Kivett's problem now," implying that Kivett was the "puppeteer" behind these acts of retaliation. (*Id.* ¶ 85.)

On July 24, 2001, plaintiff was transferred to the Clinton Correctional Facility ("Clinton"). (*Id.* ¶ 89–90.) Upon his departure, plaintiff alleges that defendant Smith asked plaintiff if he believed that Kivett would "miss [him]." (*Id.* ¶ 89.) Plaintiff's property was not distributed to him because he did not sign the inventory forms at Upstate. (*Id.* ¶ 90.) When plaintiff finally received his property one week later, he received only four out of his eight property bags. (*Id.* ¶ 91.) Plaintiff alleges that defendants Kivett, Smith, and Comstock threw away plaintiff's legal material. (*Id.* ¶¶ 83, 86, 93.) Plaintiff identifies the specific legal material that was stolen or destroyed and alleges that the loss of this material prevented him from filing a renewal motion to stop the clock for the purposes of the Antiterrorism and Effective Death Penalty Act in a timely manner, presumably for a habeas petition. (*Id.* ¶ 94.)

Sometime between July 11 and 24, plaintiff was informed that the grievance he filed about the food and syrup incidents was never received by the grievance committee. (*Id.* ¶ 95.)  On August 10, 2001, plaintiff re-filed this grievance at Upstate by mail and further grieved the loss and destruction of his property.  (*Id.*; *see also* Pl.'s Aff., Ex. 21 at 4–7.)

On August 30, 2001, plaintiff's grievance was rejected on the grounds that he was no longer a prisoner of Upstate and had to file grievances at his current facility.  (Amend. Compl. ¶ 96; *see also* Pl.'s Aff., Ex. 21 at 9.)  Plaintiff re-filed this grievance with the Clinton IGP.  (Amend. Compl. ¶ 96; *see also* Pl's Aff., Ex. 21 at 10–14.)  The grievance committee rejected his claim for the legal papers, directing him to file with Inmate Claims.  (Pl.'s Aff., Ex. 21 at 15–17.)

Aside from the specific grievances mentioned above, plaintiff further alleges that he has grieved all incidents and exhausted all of his administrative remedies in a "blanket" grievance allegation.  (Amend. Compl. at D.)

**DISCUSSION**

Plaintiff's numerous claims are addressed below.  After resolving the issue of exhaustion, the Court will address the claims in the order laid out in the original complaint.

1.  Exhaustion of Administrative Remedies

As plaintiff is a prison inmate, he is barred by the Prison Litigation Reform Act ("PLRA") from bringing federal claims "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a) (2000).  Inmates in New York State are subject to the Inmate Grievance Program instituted by the Department of Correctional

Services ("DOCS").  *Hemphill v. New York*, 380 F.3d 680, 682 (2d Cir. 2004); *see also* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1.  Inmates must file any grievance with a Grievance Clerk within fourteen calendar days of the alleged incident, although "mitigating circumstances" may toll the deadline.  N.Y. Comp. Codes R. & Regs. tit 7, § 701.7(a)(1).  The grievance is then subject to review by an Inmate Grievance Resolution Committee ("IGRC").  *Id.* § 701.7(a)(3)–(4).  If unsatisfied with the result, inmates can appeal to the facility superintendent and, subsequently, to the Central Office Review Committee ("CORC") for a final administrative determination.  *Id.* § 701.7(b)–(c).

In order for such grievances to constitute an exhaustion of state claims, grievances must be specific, not generalized:  "[I]nmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures."  *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004).  Strict adherence to the DOCS three-tiered system is not required, however, provided that plaintiff has utilized remedies sufficient to put the defendants on notice.  *Id.* (citing *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002)) (noting that the purpose of the grievance requirement is to put defendants on notice so that they have an opportunity to address complaints and holding that "[u]ncounseled inmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading" in filing grievances); *see also Braham v. Casey*, 425 F.3d 177, 183 (2d Cir. 2005) (citing same).

Exhaustion under the PLRA is not a jurisdictional question; failure to exhaust is an affirmative defense that is waiveable.  *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003); *Jenkins v. Haubert*, 179 F.3d 19, 28–29 (2d Cir. 1999).  As such, the burden is on

the defendant of proving plaintiff's failure to exhaust his administrative remedies. *See, e.g.*, *Hallet v. New York State Dep't of Corr. Svcs.*, 109 F. Supp. 2d 190, 197 (S.D.N.Y. 2000); *Warren v. Purcell*, 2004 WL 1970642, at *5 n.8 (S.D.N.Y. Sept. 3, 2004) ("It bears emphasis that it is not the plaintiff's burden to plead the elements of exhaustion in the complaint itself, but rather, the defendant's burden to raise and prove failure to exhaust in its answer or motion to dismiss."). Mere conclusory statements by a defendant that an inmate has failed to exhaust his remedies is insufficient to meet this burden. *Hallet*, 109 F. Supp. 2d at 197; *see also Gonzales v. Officer in Charge of Barber Shop*, 2000 WL 274184, at *3 (S.D.N.Y. Mar. 13, 2000) (declining to dismiss on grounds of exhaustion because premature at motion to dismiss stage to resolve dispute between parties as to whether exhaustion was necessary and/or achieved); *Nicholson v. Murphy*, 2003 WL 22909876, at *6 (D. Conn. Sept. 19, 2003) ("By characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss. Rather, the defendants must present proof of non-exhaustion."). Furthermore, if a complaint has both exhausted claims and unexhausted claims, only the unexhausted claims should be dismissed. Contrary to defendants' argument, the presence of unexhausted claims does not require the Court to dismiss the complaint in its entirety. *Ortiz v. McBride*, 380 F.3d 649, 663 (2d Cir. 2004).

The defendants have moved to dismiss four of plaintiff's claims on the grounds that he has not exhausted administrative remedies: the claim for malicious prosecution, the claims arising out of the August 2000 IMRs, and the claims arising out of the pancake syrup and veal incidents. The defendants have not, however, attached any evidence

refuting plaintiff's allegation that he has exhausted all of his administrative remedies. The defendants' conclusory statements, absent more, are insufficient to meet their burden. As such, the Court declines to dismiss any of plaintiff's claims for failure to exhaust.

2.      Denial of Due Process:  The July 2000 Shawangunk Hearing

Plaintiff brings a claim against defendant Connolly for depriving him of liberty without due process of law.  Plaintiff alleges that his confinement in the SHU deprived him of a protected liberty interest and that the hearing held from July 5 through July 21, 2000 was so manifestly unfair as to be a deprival of due process.

a.      *Is There a Protected Liberty Interest?*

In analyzing plaintiff's claim, the Court must first examine whether he had any liberty interest in avoiding SHU confinement.  Plaintiff has no right to due process unless a liberty interest has been infringed.  *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citing *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) (per curiam)).  A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only when the discipline imposes an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison.  *Id.* (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Factors relevant to determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement."  *Id.* (citing *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998)).  A plaintiff's administrative and punitive confinement should be aggregated for the purposes of determining the duration of the disciplinary segregation.  *See Sealy v. Giltner*, 197 F.3d 578, 587 (2d Cir. 1999).

In general, a prisoner has no protected liberty interest in avoiding normal SHU confinement that lasted less than 101 days. *See id.* at 589–90. If SHU conditions are especially harsh, however, confinement for less than 101 days can implicate a liberty interest. *See Palmer*, 364 F.3d at 64–65 (2d Cir. 2004) ("[W]e have explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical.") (citing *Ortiz v. McBride*, 323 F.3d at 195 & n.1).

Plaintiff was confined in the SHU from June 29 to September 18, 2000 for events related to the July 2000 Shawangunk hearing. Plaintiff's confinement from September 18 onwards was for the separate August 2000 IMRs filed by separate officers. While the Second Circuit has held that SHU confinement can be aggregated, defendant Connolly cannot be held responsible for aggregated SHU time unrelated and subsequent to his actions.[5] *See Sealy*, 197 F.3d at 587 ("With regard to the durational aspect of the atypicality issue, we must focus only on the interval during which [the defendant] is responsible, since, on this appeal, it is his alleged denial of procedural due process for which [plaintiff] seeks [damages].") As the sentence attributable to defendant Connolly was only eighty-one days, below the 101-day threshold, this confinement does not

---

[5] While plaintiff theoretically has a liberty interest in avoiding the confinement imposed after September 18, 2000, for the separate IMRs he received in August, plaintiff has made no allegations that he was deprived of due process as to those incidents and has not named any of the officers involved with those incidents as defendants in this action.

implicate a liberty interest, so long as the SHU confinement was "normal."[6]  *See Ortiz*, 380 F.3d at 655.

Plaintiff has made no cognizable allegations that his confinement from July 11 to September 18, 2000, was not "normal."[7]  He does allege that his confinement from June 29 to July 11, 2000, was abnormal, however, in that he was denied exercise time and confined to his cell for twenty-four hours a day and was forced to wear handcuffs and leg irons whenever he left his cell.  (Amend. Compl. ¶¶ 23, 63; Pl. Aff., Ex. 1.)  The fact that he was confined in his cell for twenty-four hours a day for thirteen days and forced to wear restraints whenever he left his cell may be sufficient to establish that his confinement was "atypical and significant" and thus implicates a liberty interest.  *See Ortiz*, 380 F.3d at 651, 654 (finding that plaintiff's allegation that he was, *inter alia*, confined in his SHU cell for twenty-four hours a day for the first three weeks of a ninety-day confinement, was not permitted an hour of daily exercise, and was denied regular showers stated "a hardship sufficiently 'atypical and significant' to survive a motion to dismiss"); *Palmer*, 364 F.3d at 62, 66 (plaintiff who was confined in the SHU for seventy-seven days and was deprived of personal effects, mechanically restrained whenever he was taken outside of his cell, and not allowed to have family visitations, survived a motion for summary judgment).  Absent a further factual record, it cannot be said that the conditions plaintiff was subject to from June 29 to July 11 were not "atypical

---

[6] The Second Circuit, without delineating the full scope of what constitutes "normal" SHU conditions, has stated that conditions in which prisoners "are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week" are considered normal.  *Ortiz*, 380 F.3d at 655.

[7] Plaintiff does allege that prisoners confined in the SHU who successfully complete thirty days of "good behavior" usually receive more privileges (Amend. Compl. ¶ 45) and that due to falsification of reports by defendant Connolly, plaintiff did not receive these "good behavior" privileges.  Even assuming that prisoners generally do get increased SHU privileges after thirty days, these SHU privileges do not constitute a protected liberty interest for the purposes of due process.  *Farid v. Ellen*, 2006 WL 59517, at *6 (S.D.N.Y. Jan. 11, 2006).

and significant," and therefore the Court cannot say that there was no infringement of a liberty interest as a matter of law.[8]

>    b.    Was There a Deprivation of Due Process?

Even if plaintiff has a protected liberty interest, in order to survive defendant's 12(b)(6) motion, plaintiff must also allege that defendant imposed this sentence without providing due process. *Ortiz*, 380 F.3d at 655. Plaintiff alleges that he was denied due process because: defendant Connolly was a biased officer who had predetermined plaintiff's guilt, plaintiff was denied competent employee assistance in preparing his defense, plaintiff was not allowed to call witnesses, and plaintiff was not allowed to "comment on the evidence."

An inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (per curiam). In situations when an inmate is unable to "marshal evidence and present a defense," however, such as when he is confined to an SHU, he has the right to some assistance. *Id.* (citing *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988)). Such assistance should, at least, include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. *Eng*, 858 F.2d at 898.

Here, plaintiff was confined in the SHU pending his hearing and therefore was entitled to employee assistance. In his complaint, plaintiff alleges that his assistant refused to retrieve documents for him on the grounds that they were irrelevant. Furthermore, not only did his assistant not interview witnesses, plaintiff alleges that his

---

[8] While the Second Circuit held that eighteen days of SHU confinement without exercise did not constitute a protected liberty interest in *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998), that case was decided on summary judgment where "[t]he district court . . . sufficiently examined the circumstances of Arce's segregation and articulated the facts on which its conclusion was predicated."

assistant actively pressured and threatened witnesses *not* to testify. If true, this certainly

falls short of the required level of employee assistance and, as such, implies that plaintiff

was denied due process.

An inmate also has a right to call witnesses, and a hearing officer "may not refuse

to interview an inmate's requested witness without assigning a valid reason." *Ayers v.*

*Ryan*, 152 F.3d 77, 81 (2d Cir. 1998) (citing *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir.

1990) (per curiam)). The burden is not on the plaintiff to show that the official's conduct

was "arbitrary and capricious" but is on the hearing officer to prove that the denial of

witnesses is "logically related to preventing undue hazards to 'institutional safety or

correctional goals.'" *Fox*, 893 F.2d at 478. Where, as here, plaintiff allegedly sought to

present witnesses to contradict his accusers' account of events, the hearing officer is not

permitted to exclude them on grounds of redundancy without an interview and some

showing that their testimony would have been redundant. *Id.* As such, the denial of

witnesses at plaintiff's hearing may be shown to have violated due process.

It has "long been established" that an inmate has the right to an impartial hearing

officer. *Black v. Coughlin*, 76 F.3d 72, 76 (2d Cir. 1996). Given the alleged conduct of

defendant Connolly during the hearing, coupled with the fact that he was the same officer

who had ordered the mechanical restraints and exercise deprivation before the hearing

began, there is at least an inference of bias that plaintiff should be given the opportunity

to prove.

c.      *Is There Qualified Immunity?*

Prison officials performing tasks entrusted to their discretion typically "are

shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." *Palmer*, 364 F.3d at 67. Whether plaintiff's liberty interest was clearly established depends, in turn, on whether the duration and conditions of plaintiff's confinement in the SHU not only infringed a liberty interest but also were of such a degree that an officer in defendant's position should have known that plaintiff's liberty interests were at stake. *Id.* In analyzing qualified immunity, the Court should look to the sentence initially imposed, regardless of the time actually served. *Hanrahan v. Doling*, 331 F.3d 93, 98 (2d Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 207 (2001)).

Here, Connolly originally sentenced plaintiff to a five-year sentence in the SHU. (Amend. Compl. ¶ 41.) A five-year sentence clearly triggers due process protection, and Connolly should clearly have known that plaintiff's liberty interests were at stake. *See Palmer*, 364 F.3d at 67 (citing *Hanrahan*, 331 F.3d at 99 (stating that no "credible argument" could be made that it was not "clearly established" that a ten-year solitary confinement disciplinary sentence would trigger due process protections); *Tellier v. Fields*, 280 F.3d 69, 85 (2d Cir. 2000) (finding it was objectively unreasonable to confine the plaintiff in SHU for 514 days without providing due process and that officials were therefore not entitled to qualified immunity)). Furthermore, it will be defendant's burden to show the nonexistence of a clearly established right and his entitlement to qualified immunity, *Palmer*, 364 F.3d at 67 (citing *Tellier*, 280 F.3d at 84), so dismissal on this basis would be premature on a motion to dismiss.

      *d.*    *Conclusion*

A court may dismiss claims under Rule 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the

allegations." *Ruiz v. E.J. Elec. Co.*, 2005 WL 3071276, at *2 (S.D.N.Y. Nov. 15, 2005).

As plaintiff has alleged conditions of his SHU confinement that may give rise to a

protected liberty interest and has alleged facts that establish that his disciplinary hearing

may have violated due process, plaintiff has made out a cognizable claim. As such, the

defendants' motion to dismiss due process claims arising out of the July 2000

Shawangunk hearing is denied.

3.   Cruel and Unusual Punishment:  Eastern SHU's Twenty-Four Hour Lighting
     Policy

Plaintiff brings claims against defendants David Miller, the superintendent of

Eastern, and Two Unknown Officers of Eastern Prison Special Housing Unit, for cruel

and unusual punishment inflicted during the thirty-five days he was confined at Eastern

by the twenty-four hour lighting policy at the Eastern SHU.

In order to prevail on an Eighth Amendment claim due to the conditions of a

prisoner's confinement, a plaintiff must show "both an objective element—that the prison

officials' transgression was sufficiently serious—and a subjective element—that the

officials acted, or omitted to act, with a sufficiently culpable state of mind, i.e., with

deliberate indifference to inmate health or safety." *Phelps v. Kapnalos*, 308 F.3d 180,

185 (2d Cir. 2002) (citations and internal quotation marks omitted). As to the objective

element, "states must not deprive prisoners of their basic human needs—e.g., food,

clothing, shelter, medical care, and reasonable safety. Nor may prison officials expose

prisoners to conditions that pose an unreasonable risk of serious damage to [their] future

health." *Id.* (citations and internal quotation marks omitted) (denying motion to dismiss

plaintiff's cruel and unusual punishment claim where plaintiff claimed he had been fed

nutritionally deficient food for fourteen days). As to the subjective element, "[t]his

deliberate indifference element is equivalent to the familiar standard of recklessness as used in criminal law. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 186 (citations and internal quotation marks omitted).

Plaintiff here has alleged specific injury resulting directly from Eastern's twenty-four hour lighting policy and the resultant sleep deprivation, namely "fatigue during the day, loss of appetite, vomiting, migraine headaches, anxiety, elevation of blood pressure, and a violent aggravation of rashes all over [his] body." (Amend. Compl. ¶ 55.) Plaintiff alleges that he complained numerous times to correction officers and through a grievance that was specifically denied by the Eastern superintendent, defendant David Miller. Plaintiff's allegations, if true, can sustain a claim both that this lighting policy posed an objectively unreasonable risk to his health and that prison officials knew that there was a substantial risk and failed to act. *See Ciaprazi v. Goord*, 2005 WL 3531464, at *2, *10 (N.D.N.Y. Dec. 22, 2005) (adopting magistrate judge's report denying defendant's motion to dismiss plaintiff's Eighth Amendment claim alleging cruel and unusual conditions in the Upstate SHU including, *inter alia*, exposure to light for nineteen hours per day); *Amaker v. Goord*, 1999 WL 511990, at *7, *8 (S.D.N.Y. July 20, 1999) (holding that a plaintiff's allegations that the lighting conditions in the SHU were poor and that defendants knew about them but failed to fix them would satisfy both the objective and subjective prongs of the cruel and unusual punishment test); *see also LeMaire v. Maass*, 745 F. Supp. 623, 636 (D. Or. 1990) ("There is no legitimate

penological justification for requiring plaintiff to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional."), *vacated* 12 F.3d 1444, 1459 (9th Cir. 1993) after, *inter alia*, prison officials agreed to change their lighting policy; *Keenan v. Hall*, 83 F.3d 1083, 1091–92 (9th Cir. 1996) (citing *LeMaire* favorably and denying defendant's summary judgment motion with respect to plaintiff's Eighth Amendment claim where plaintiff produced evidence of sleeping problems due to twenty-four hour lighting despite defendant's contrary evidence that such lighting would not cause sleeping problems).

Defendants' motion to dismiss cruel and unusual process claims arising from the Eastern SHU's twenty-four hour lighting policy is therefore denied.

4.      Denial of Access to the Courts

Plaintiff alleges that defendants Kivett, Smith, and Comstock intentionally destroyed his legal papers in July 2001, thereby preventing him from filing a motion to stop the clock in order to file a timely habeas petition.[9]

Petitioners have a constitutional right of access to the courts, arising from the First Amendment, the Due Process Clause, and the Privileges and Immunities Clause of Article IV. *See, e.g.*, *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995); *Morello v. James*, 810 F.2d 344, 346 (2d Cir. 1987). To prove a violation of that right, a plaintiff must demonstrate that state action hindered his efforts to pursue a nonfrivolous legal claim and

---

[9] Plaintiff's complaint, read liberally, can also be read to bring claims against defendants Mullen and Eisensmidt for denying him access to his cell after he was sentenced to the SHU in May 2001, resulting in the loss of some of his legal papers. Mere negligence resulting in the loss of legal papers, however, does not state an actionable claim; plaintiff "must allege facts demonstrating that defendants *deliberately and maliciously* interfered with his access to the courts." *Smith v. O'Connor*, 901 F. Supp. 644, 649 (S.D.N.Y. 1995) (emphasis added); *see also Love v. Coughlin*, 714 F.2d 207, 208−09 (2d Cir. 1983) (per curiam) (holding that a negligent loss of legal documents is not actionable if the state provides an adequate compensatory remedy). As such, the defendants' motion to dismiss any claims arising out of a negligent loss of plaintiff's legal papers is granted, and the Court shall consider only those claims where plaintiff alleges that the defendants *deliberately* stole his legal papers.

that consequently he suffered some actual concrete injury. *Lewis v. Casey*, 518 U.S. 343, 350 (1996). The "point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002). The right to access to the courts, therefore, is "ancillary to the underlying claim, without which a plaintiff would suffer no injury from being denied access." *Id.* at 415. Furthermore, when the access claim "looks backward" (i.e., seeks recompense for a lost opportunity to seek some order of relief), "the complaint must identify a remedy that may be awarded as recompense *but not otherwise available* in some suit that may yet be brought." *Id.* (emphasis added); *see also Hoard v. Reddy*, 175 F.3d 531, 533 (7th Cir. 1999) (finding there is no access claim where prisoner has some other route to challenging the validity of his conviction).

First, although plaintiff claims he is forever barred from pursuing his habeas petition, an alternative course of action with respect to this claim is to file his habeas petition and request equitable tolling in light of defendants' alleged destruction of his legal materials. *See Valverde v. Stinson*, 224 F.3d 129, 133 (2d Cir. 2000) (holding that confiscation of a prisoner's habeas corpus petition "shortly before the filing deadline may justify equitable tolling and permit the filing of a petition after the statute of limitations ordinarily would have run"). Furthermore, in this case the alleged nonfrivolous underlying cause of action is plaintiff's habeas petition, and the lost remedy of that habeas petition is his release. But plaintiff is not seeking injunctive relief here; rather he is seeking damages under § 1983. This, as defendants argue, implicates *Heck v. Humphrey*'s bar against § 1983 claims for damages on any theory that implies that a conviction is invalid, unless he can "prove that the conviction or sentence has been

reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. Although plaintiff must only establish that his claim is nonfrivolous, or colorable, in order to make out his access to courts claim, this does not avoid the holding of *Heck*, because the remedy in an access to courts claim (where injunctive relief is not sought) are damages to compensate for the loss of the underlying action. *Nance v. Vieregge*, 147 F.3d 589, 591–92 (7th Cir. 1998); *Hoard*, 175 F.3d at 533–34 (emphasis added) ("If a prisoner whose access to the courts is being blocked in violation of the Constitution *cannot* prove that, had it not been for the blockage, he would have won his case, or at least settled it for more than $0 (the point emphasized in *Lewis*) *he cannot get damages* but he can get an injunction.").[10] In order to be awarded damages, plaintiff will have to prove that he would have prevailed in his habeas petition. An award of damages in plaintiff's access claim, therefore, would necessarily imply the invalidity of plaintiff's underlying conviction, contrary to the rule of *Heck*. *Cf. Barnwell v. West*, 2006 WL 381944, at *3 n.3, *4 (adopting unobjected-to portion of a magistrate judge's report and recommendation finding that plaintiff may not pursue compensatory or punitive damages under *Heck* in an access claim where the underlying claim is a habeas petition). Defendants' motion to dismiss plaintiff's access claim is therefore granted.

---

[10] As the Seventh Circuit noted in *Hoard*, "[i]n the setting of *Heck*, there is nothing corresponding to a colorable claim; either the conviction was invalid, in which case the defendant suffered a legally cognizable harm, or it is not and he did not." *Id.* at 534.

5.    Malicious Prosecution

Plaintiff brings claims against defendants Ryan, Bertone, Kivett, and McCreery for pressing charges and bringing a malicious prosecution against him for assault, on the basis of the June 2000 Shawangunk incident.

To bring a § 1983 claim for malicious prosecution, a plaintiff must show "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions," along with a "post-arraignment seizure" that implicates the Fourth Amendment. *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) (in order to prevail on a § 1983 claim for malicious prosecution, plaintiff must show that "injuries were caused by the deprivation of liberty guaranteed by the Fourth Amendment.").

Plaintiff has failed to establish the required post-arraignment seizure necessary for a federal § 1983 claim. As plaintiff was already incarcerated at the time of the assault proceeding, he suffered no new seizure. An inmate already incarcerated has not suffered any unconstitutional deprivation of liberty as a result of being charged with new criminal offenses and being forced to appear in court to defend himself. *Wright v. Kelly*, 1998 WL 912026, at *3 (W.D.N.Y. Oct. 16, 1998); *see also, e.g., Rauso v. Romero*, 2005 WL 1320132, at *2 (E.D. Pa. June 2, 2005) ("Here, moreover, plaintiff did not sustain a 'deprivation of liberty consistent with the concept of a seizure' . . . since he was already in prison at the time.") (citing *Donohue v. Gavin*, 280 F.3d 371, 380 (3d Cir. 2002)); *Turner v. Schultz*, 130 F. Supp. 2d 1216, 1225 (D. Colo. 2001) ("Mr. Turner has cited,

and I have found, no clearly established law that states that an already lawfully incarcerated prisoner is seized for Fourth Amendment purposes when he is charged with an additional crime. Because Mr. Turner was already effectively 'seized,' throughout the time period in question, it is doubtful whether the additional prosecution could result in an actionable seizure.") (citing *Taylor v. Meacham*, 82 F.3d 1556, 1561 n.5 (10th Cir. 1996)).[11]

Plaintiff has not stated a cognizable claim for malicious prosecution under § 1983, and, as such, defendants' motion to dismiss this claim is granted.

6.      Retaliation

Plaintiff brings claims against defendants for retaliation, alleging that defendants retaliated against him by: (1) falsifying his behavior report during his August 2000 Shawangunk SHU confinement to justify denying him privileges; (2) filing false IMRs against him in August 2000; (3) filing a false IMR against him in December 2000 for loss/damage of property, failing to have an identification card, mess hall violations, and impersonation; (4) filing a false IMR against him in March 2001 by exaggerating a fight between plaintiff and another inmate, (5) filing a false IMR against him in May 2001, falsely accusing him of fighting with another inmate; (6) destroying his legal material; and (7) confining him in keeplock in Sing Sing in November 2000 beyond his sentence.

---

[11] Plaintiff argues that even if he was not seized for the purposes of the Fourth Amendment, he has a substantive due process right in remaining free of prosecutions. Substantive due process, however, does not encompass the right to be free from prosecution. *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) (citing *Albright v. Oliver*, 510 U.S. 266, 274–75 (1994) (plurality opinion); *id.* at 281 (Kennedy, J., concurring in the judgment); *id.* at 288–89 (Souter, J., concurring in the judgment)).

Plaintiff argues that the rule adopted above would basically allow prison officials to initiate all sorts of prosecutions against inmates, confident in the fact that they could not be sued under § 1983 because the prisoners were already "seized." In such an event, however, plaintiff's remedy is a *state* malicious prosecution claim, which does not have § 1983's requirement of a post-arraignment seizure. (In this case, however, the New York one-year statute of limitations period for a malicious prosecution, N.Y. C.P.L.R. 215(3), has long since passed.)

Plaintiff also brings a general claim of retaliation against the defendants; reading his complaint liberally, plaintiff alleges that the retaliatory acts included (8) converting his keeplock sentence to SHU confinement in March 2001; (9) pouring pancake syrup over his belongings; and (10) giving him his evening meal without the veal ration in April 2001. Plaintiff alleges that defendants retaliated against him because plaintiff successfully appealed his July 2000 Shawangunk hearing and challenged, and was ultimately acquitted of, the related criminal assault charges brought by the defendants.

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e.g.*, *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.2002); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988). Courts, however, "must approach prisoner claims of retaliation with skepticism and particular care" because claims are easily fabricated and because these claims may cause unwarranted judicial interference with prison administration. *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Gill v. Pidlypchack*, 389 F.3d 39, 385 (2d Cir. 2004).

To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

It is not disputed plaintiff's appeal of his July 2000 disciplinary conviction and defense against criminal assault charges, is protected conduct.[12]  As such, plaintiff has met the first prong of the retaliation test.

The second prong concerns whether adverse action was taken against plaintiff. For the purposes of retaliation, an adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."  *Gill*, 389 F.3d at 380 (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). The test is an objective one that applies even if the plaintiff in question was not himself subjectively deterred.  *Id.* (citing *Davis*, 320 F.3d at 353–54).  If the action would not deter an individual of ordinary firmness, however, the retaliatory act "is simply *de minimis* and therefore outside the ambit of constitutional protection."  *Davis*, 320 F.3d at 353.

The final prong is the requirement of a causal connection between the protected conduct and the adverse action.  In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including:  (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his

_____

[12] Courts have held that *procedural* due process does not mandate that prison officials must provide an appeals procedure for disciplinary hearings.  *See, e.g.*, *Hernandez v. Selsky*, 2006 WL 566476, at *3 (N.D.N.Y. Mar. 7, 2006) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–70 (1974)); *Gates v. Selsky*, 2005 WL 2136914, at *8 (W.D.N.Y. Sept. 2, 2005).  Nonetheless, given that New York State does provide such a procedure, plaintiff has a *substantive* constitutional right to avail himself of it.  *See Franco*, 854 F.2d at 589 (2d Cir. 1988) (noting that retaliation that does not implicate procedural due process can nonetheless be unconstitutional if it infringes upon a prisoner's substantive right "to petition government for redress of grievances.")  Plaintiff's exercise of the DOCS disciplinary appeal procedure is therefore protected conduct.
     Defending oneself against criminal assault charges is protected conduct as well.  It goes without saying that plaintiff, like all persons, has a constitutional right to defend himself in court against criminal charges.  U.S. Const. amends. V, VI, XIV.

motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 872–73). At this stage, it is not appropriate to weigh the evidence or decide whether the claimant will ultimately prevail. *Id.* at 728. Even at the motion to dismiss stage, however, plaintiff must offer more than mere conclusory allegations that a causal connection existed between the protected conduct and the adverse action. *Dawes*, 239 F.3d at 491–92.

As a preliminary matter, the Court notes that plaintiff's allegations that defendants poured syrup on his property and once served him a meal without veal are *de minimis*. *See Snyder v. McGinnis*, 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (granting a motion to dismiss because the denial of food on two occasions is *de minimis* and not actionable). As they would not have deterred a person of ordinary firmness from exercising his constitutional rights, they do not give rise to a cognizable retaliation action. As such, defendants' motion to dismiss any retaliation claims stemming from those incidents is granted. The other alleged actions, however, namely that the defendants filed false IMRs against plaintiff, kept him in keeplock, transferred him to the SHU, and stole his legal papers, are sufficiently serious to constitute adverse actions. *See Franco*, 854 F.2d at 589 (filing false misbehavior reports can constitute retaliatory action); *Auleta v. LaFrance*, 233 F. Supp. 2d 396, 402 (N.D.N.Y. 2002) (placing a prisoner in keeplock for seven and a half days properly construed as an adverse action); *Lashley v. Wakefield*, 367 F. Supp. 2d 461, 467 (W.D.N.Y. 2005) (finding that keeplock confinement from nine to twenty days sufficiently adverse to support a retaliation claim); *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) (noting that prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights, even though a prisoner has

no liberty interest in remaining at a particular correctional facility); *Smith v. City of New York*, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (noting that theft of legal papers substantial enough to qualify as adverse action for purposes of retaliation claim). The question, therefore, is whether plaintiff has made nonconclusory allegations that give rise to a causal connection between these actions and his protected conduct.

a. *Loss of SHU Privileges*

Plaintiff first brings a retaliation claim against defendant Connolly. Plaintiff alleges that Connolly falsified his records in August 2000 to reflect that he "fail[ed] to conform to standards of good behavior" as an excuse to deny him additional privileges out of retaliation for appealing Connolly's disposition of the July 2000 Shawagunk hearing. (Amend. Compl. ¶ 45.) Given that this alleged falsification took place only days or weeks after the hearing itself, and given the fact that Connolly issued the pre-hearing confinement orders, acted as the hearing officer at the hearing itself, and oversaw plaintiff's SHU confinement after the hearing, plaintiff's allegations give rise to an inference that there is a causal connection between plaintiff's protected conduct in challenging the hearing and Connolly's alleged retaliatory conduct. As such, this claim withstands a motion to dismiss.

b. *The August 2000 IMRs*

Plaintiff has not satisfied the causation element of his retaliation claim with regard to the August 2000 IMRs. Plaintiff has not alleged any facts in his complaint that could establish a causal connection between the Shawangunk hearing and the IMRs, or any details about the IMRs whatsoever. In fact, in his complaint, plaintiff admits that the IMRs were deserved and that he was indeed misbehaving out of frustration. As plaintiff

has not pleaded any causal connection between these IMRs and his protected conduct beyond wholly broad, conclusory statements, defendants' motion to dismiss is granted.

      *c.*       *The December 2000 IMR*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the December 2000 IMR issued by defendant Deckelbaum. Plaintiff has not proffered any nonconclusory allegations showing any causal connection between the July 2000 Shawangunk hearing and Deckelbaum's IMR for lack of ID and mess hall violations or that Deckelbaum acted out of retaliation, especially considering that plaintiff admits that he did not have ID and had received an extra ration from another inmate. As such, defendants' motion to dismiss is granted.

      *d.*       *The March 2001 IMR and Hearing*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the March 2001 IMR written up by defendant Grant and the resultant hearing presided over by defendant Colao. Plaintiff has not proffered any nonconclusory allegations showing a causal connection with the July 2000 Shawangunk hearing and the IMR plaintiff received for fighting, especially considering that plaintiff admits that he was fighting. Even if plaintiff alleges that defendants falsified his IMR to exaggerate the seriousness of the fight, plaintiff has not advanced allegations that would establish that they filed the IMR because of the Shawangunk hearing. As such, defendants' motion to dismiss is granted.

e.      *The May 2001 IMR*

Plaintiff has, however, alleged sufficient facts to give rise to an inference of a causal connection with respect to the May 2001 IMR and resultant hearing.  Plaintiff alleges that defendants Sweeney, Scott, and Rich falsely accused him of fighting with LaFontaine in order to ensure his return to SHU confinement just days after he was released from his March 2001 sentence.  Plaintiff alleges that the May fight with LaFontaine never occurred, and that the defendants fabricated the entire charge.  (*See* Amend. Compl. ¶ 165.)  This allegation, combined with Sweeney's alleged statement that plaintiff "would get all of [his] time owed here," and the fact that the findings of this hearing were ultimately reversed and expunged, states a colorable claim of retaliation.  *See Baskerville*, 224 F. Supp. 2d at 732–33.

f.      *Destruction of Legal Material*

Plaintiff brings a retaliation claim against defendants Kivett, Smith, and Comstock for destroying his legal material in July 2001 in retaliation for successfully defending himself during his criminal trial for assault charges in June.  The theft of his legal material took place just weeks after plaintiff was acquitted, giving rise to an inference of causality.  *See Smith*, 2005 WL 1026551, at \*4.  In addition, plaintiff alleges that Kivett came up to plaintiff and said, "you beat us again" and sarcastically stated that he would "make sure [plaintiff] received [his] property" and made comments as a direct response to plaintiff's acquittal at trial.  (Amend. Compl. ¶ 82.)  Plaintiff here has alleged enough nonconclusory facts linking the theft of his legal papers to his constitutionally protected right to defend himself in court to withstand a motion to dismiss.  *See Smith*, 2005 WL 1026551, at \*4 (finding that defendant's statement "I don't like you, I'm pretty

sure you know why" combined with "highly suspicious timing" of destruction of plaintiff's property was sufficient to defeat defendant's motion for summary judgment).

g.    *The November 2000 Keeplock*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the ten days of keeplock that he served from November 7 to November 17, 2000. This time was attributable to the IMRs plaintiff received in August. Plaintiff has offered no nonconclusory allegations to establish that this keeplock time was the result of retaliation. As such, defendants' motion to dismiss is granted.

h.    *The March to May 2001 SHU Confinement*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to defendants' conversion of his keeplock status to SHU time in March 2001. Plaintiff has proffered no nonconclusory allegations that could establish a causal connection linking this transfer to any protected conduct sufficient to state a claim for retaliation.

i.    *Conclusion*

Plaintiff has alleged sufficient nonconclusory facts to make out a claim for retaliation against defendant Connolly for falsifying his records to deny him SHU privileges in August 2000; against defendants Sweeney, Scott, and Rich for falsely accusing him of fighting in May 2001; and against defendants Kivett, Smith, and Comstock for destroying his legal material out of retaliation. The defendants' motion to dismiss all other claims of retaliation is granted.

7. <u>Abuse of Process</u>

Plaintiff brings a claim for abuse of process, alleging that the defendants brought these various criminal and administrative charges against plaintiff for the purpose of abusing the process.

State law provides the elements of the cause of action for a claim of abuse of process in § 1983 suits. *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 550 (E.D.N.Y. 2004). Under New York law, abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of process in a perverted manner to obtain a collateral objective. *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984). In order to bring a claim for malicious process, plaintiff must allege "the improper *use* of the process after it has issued." *Id.* (emphasis added). "A malicious motive alone, however, does not give rise to a cause of action for abuse of process." *Id.*

Plaintiff has not alleged any facts to sustain a claim for abuse of process. While plaintiff has alleged that the defendants brought criminal assault charges against him in Ulster County and have filed numerous prison administrative charges against him, he does not allege that they did so to abuse the *process*. Even assuming plaintiffs brought these charges out of malice or had other improper motives in bringing these charges, a bad motive alone does not give rise to an abuse of process claim. As a result, defendants' motion to dismiss this cause of action is granted.

8. <u>Denial of Due Process: The March to May 2001 Upstate SHU Confinement</u>

Plaintiff alleges that he was deprived of due process stemming from his confinement in the Upstate SHU from March 19 to May 17, 2001. Plaintiff alleges that

he was sentenced to ninety days under keeplock as a result of his March 1 fight with inmate LaFontaine, but that his sentence was improperly converted from a keeplock sentence to an SHU sentence.

Defendants originally moved to dismiss this claim on the grounds that it arises out of the March 2001 Sing Sing hearing, which has not been overturned.  In support of their motion, defendant argued that plaintiff lost nine months of "good time" credit at the hearing and is therefore barred by *Heck v. Humphrey*, *supra*, from any claims arising out of that hearing unless and until it is overturned.  (Defs.' Supp. Mem. of Mot. to Dismiss 17.)  Plaintiff argues in response (Pl.'s Objections to the Report 9), and defendants concede (Defs.' Mem. In Opp'n to Pl.'s Objections 7), however, that *Heck* does not apply here, as plaintiff is serving a life sentence, and the loss of good time credits therefore has no effect on the length of his sentence.  *Gomez v. Kaplan*, 2000 WL 1458804, at *12 (S.D.N.Y. Sept. 29, 2000) (citing *Jenkins*, 179 F.3d 19); *see also Farid v. Ellen*, 2006 WL 59517, at *8 & n.2 (S.D.N.Y. Jan. 11, 2006).  As such, plaintiff's claim is not barred by *Heck*.

Plaintiff's claim, however, is not that the March 2001 Sing Sing hearing lacked due process.  Plaintiff maintains instead that he is entitled to *additional* due process before the keeplock sentence he received at the Sing Sing hearing can be properly converted into an SHU sentence, since SHU conditions entail harsher deprivations than keeplock.  (*See* Pl.'s Objections to the Report 12.)

To prevail in his due process claim, plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*, and that the state has granted its inmates, by regulation or by statute, a protected liberty

interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81

F.3d 313, 317 (2d Cir. 1996); *see also Sealey*, 197 F.3d at 51. Plaintiff alleges that this

SHU confinement lasted for fifty-nine days, during which time he was confined to his

cell and an adjacent area for twenty-four hours a day. Given that twenty-four hour

confinement may be "atypical and significant," *see Ortiz*, 380 F.3d at 655, plaintiff may

have a protected liberty interest in avoiding this confinement, despite the fact that it

lasted for less than 101 days. *See Palmer*, 364 F.3d at 64–65. The remaining issue is

whether plaintiff was entitled to an additional hearing before his transfer to the Upstate

SHU.

New York prison regulations permit inmates to be confined in the SHU for

"disciplinary confinement, administrative segregation, protective custody, detention,

*keeplock confinement*, and 'for any other reason, with the approval of the deputy

commissioner for facility operations.'" *See, e.g.*, *Gonzales v. Narcato*, 363 F. Supp. 2d

486, 493 (E.D.N.Y. 2005) (emphasis added) (citing *Trice v. Clark*, 1996 WL 257578, at

*3 (S.D.N.Y. May 16, 1996)). Admission to SHU pursuant to a keeplock sentence is

authorized under New York Regulations. *See* N.Y. Comp. Codes. R. & Regs. tit. 7, §

301.6. Section 301.6 is the New York Regulation relating to keeplock admissions and

authorizes placement of inmates in SHU "at a medium or minimum security correctional

facility *or Upstate Correctional Facility*" "for confinement pursuant to a disposition of a

disciplinary (Tier II) or superintendent's (Tier III)[13] hearing." *Id.* (emphasis added).

---

[13] "New York conducts three types of disciplinary hearings for its inmates. Tier I hearings address the least serious infractions and have as their maximum punishment loss of privileges such as recreation. Tier II hearings address more serious infractions and may result in 30 days of confinement in a Special Housing Unit ('SHU'). Tier III hearings concern the most serious violations and may result in unlimited SHU confinement (up to the length of the sentence) and recommended loss of 'good time' credits." *Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d. Cir. 1998).

Furthermore subparts (c) through (h) of section 301.6 clearly contemplate that inmates sentenced to keeplock status may be assigned to SHU, subject to the property, visiting, package, commissary, telephone, and correspondence limitations set forth in section 302.2(a)–(j). *Id.*; *see also Chavis v. Kienert*, 2005 WL 2452150, at *10 (N.D.N.Y. Sept. 30, 2005) (stating that "upon admission to Upstate Correctional Facility, plaintiff was confined in SHU to serve out his Coxsackie Correctional Facility keeplock sentence and that New York Regulations specifically authorize such confinement" and further finding that because plaintiff did not raise any claim that deprivations suffered were contrary to section 302.2(a)–(j), no liberty interest was implicated).

While it is "firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement," *Ciaprazi*, 2005 WL 3531464, at *11, plaintiff may only sustain a cause of action to vindicate the infringement of that liberty interest where he has been deprived of due process, *Ortiz*, 380 F.3d at 655. As noted, plaintiff does not allege that the March 2001 Sing Sing hearing denied him due process. Plaintiff has been afforded a full evidentiary hearing on the misconduct underlying the time spent in Sing Sing keeplock and Upstate SHU, cannot point to any regulation entitling him to an additional hearing prior to his transfer to Upstate, and therefore cannot show that he has been deprived of a protected liberty interest without due process. *Cf. Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995) (dismissing plaintiff's due process claim and finding that prisoner not entitled to reclassification hearing when, after being found guilty of major misconduct and placed in punitive detention for thirty days, he was released into administrative segregation

instead of to the general prison population, since the subsequent reclassification to administrative segregation was based upon findings of guilt at a full evidentiary hearing).

Defendants' motion to dismiss plaintiff's due process claim with respect to the conversion of his keeplock sentence into SHU time is therefore granted.

9.      Cruel and Unusual Punishment: Upstate SHU's Twenty-Four Hour
        Double-Celling Policy

Plaintiff brings an Eighth Amendment claim alleging that Upstate SHU's practice of confining two prisoners in a single SHU cell for twenty-four hours a day constitutes cruel and unusual punishment.

To establish a claim for cruel and unusual punishment, "a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps*, 308 F.3d at 185. While the Eighth Amendment bars prison officials from depriving prisoners of their "basic human needs" and prohibits exposing them to conditions that "pose an unreasonable risk of serious damage to [their] future health," it "does not mandate comfortable prisons." *Id.* Furthermore, to bring a claim for cruel and unusual punishment, plaintiff must allege that the defendants acted with "deliberate indifference," i.e. that they "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.*

Unlike his claim for the twenty-four hour lighting in Eastern SHU, plaintiff has not alleged facts that would support either the objective or the subjective prong for Upstate's double-celling policy. While he has alleged specific health problems resulting from his exposure to the lighting, plaintiff here has not alleged that double-celling poses an unreasonable risk, or any risk at all, to his health. Furthermore, while plaintiff alleged

that he complained about the 24-hour lighting policy to his guards and filed grievances with the IGP, the prison superintendent, and the CORC, plaintiff has not alleged that he filed any grievances or complained about the double-celling to anyone sufficient to put the defendants on notice that a substantial risk of serious harm exists.  As plaintiff has not made out a cognizable claim for cruel and unusual punishment due to Upstate's double-celling policy, the defendants' motion to dismiss is granted.

10.    Venue

Defendants have moved to dismiss plaintiff's action on the grounds of improper venue or, in the alternative, to transfer the action to the Northern District of New York. A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.  28 U.S.C. § 1391(b).

Once a proper venue objection has been raised, the burden is on the plaintiff to show that venue is proper, and he must show that venue is proper as to each claim against each defendant.  *See, e.g.*, *Degrafinreid v. Ricks*, 2004 WL 2793168, at *6 (S.D.N.Y. Dec. 6, 2004).  For the purposes of venue, state officers "reside" in the district where they perform their official duties.  *Amaker v. Haponik*, 198 F.R.D. 386, 391 (S.D.N.Y. 2000); *Baker v. Coughlin*, 1993 WL 356852, at *2 (S.D.N.Y. Sept. 9, 1993).  If a case is

improperly venued, the district court may either dismiss the case or, in the interest of justice, transfer it to a district in which venue is proper. 28 U.S.C. § 1406(a).

None of plaintiff's surviving claims are properly venued in the Southern District. All of the remaining defendants are DOCS officials who work in the Northern or Western Districts. Furthermore, all of the incidents for which there are cognizable claims occurred at Shawangunk, Eastern, and Upstate, all of which are in the Northern District, and Five Points, which is in the Western District. Plaintiff has not made a showing that "a substantial part of the events or omissions giving rise" to any cognizable claim arose in the Southern District.

In addition, even if venue were proper in the Southern District, the Court may transfer claims "for the convenience of the parties, in the interest of justice." 28 U.S.C. § 1404(a). As plaintiff could have brought his claims in the Northern District, the majority of the events arose there, and the majority of defendants reside there, it would be in the interests of justice to transfer this case even if venue were proper here. *See, e.g.*, *Shariff v. Goord*, 2005 WL 2087840, at *7 (S.D.N.Y. Aug. 26, 2005). Furthermore, as plaintiff resides in the Western District and has already brought this action outside his home district, he has already demonstrated that laying venue elsewhere in the state is not unduly burdensome. *See Madison v. Mazzuca*, 2004 WL 3037730, at *15 (S.D.N.Y. Dec. 30, 2004).

Plaintiff's surviving claims shall be transferred to the Northern District of New York pursuant to 28 U.S.C. § 1406(a) or, in the alternative, 28 U.S.C. § 1404(a).

**CONCLUSION**

Defendants' motion to dismiss **[25]** plaintiff's claims against (1) defendant Connolly for denial of due process arising out of his July 2000 Shawangunk hearing; (2) defendants Miller and Two Unknown Officers of Eastern Prison Special Housing Unit for cruel and unusual punishment arising out of the 24-hour lighting policy at Eastern; (3) defendant Connolly for retaliation (by falsifying plaintiff's SHU records to deny him privileges in August 2000); (4) defendants Sweeney, Scott, and Rich for retaliation for falsely filing an IMR against him in May 2001 and sentencing him to the SHU; and (5) defendants Kivett, Smith, and Comstock for retaliation for stealing his legal material in July 2001 is DENIED.

Defendants' motion to dismiss **[25]** all of plaintiff's remaining claims is GRANTED.  Furthermore, defendants' motion to transfer venue is hereby GRANTED. The Clerk of this Court is directed forthwith to take all steps necessary to transfer the remainder of this case to the Northern District of New York.


SO ORDERED.

Dated: New York, New York
       March 31, 2006

                                    _____
                                         Richard J. Holwell
                                    United States District Judge

## CONCLUSION

Defendants' motion to dismiss **[25]** plaintiff's claims against (1) defendant Connolly for denial of due process arising out of his July 2000 Shawangunk hearing; (2) defendants Miller and Two Unknown Officers of Eastern Prison Special Housing Unit for cruel and unusual punishment arising out of the 24-hour lighting policy at Eastern; (3) defendant Connolly for retaliation (by falsifying plaintiff's SHU records to deny him privileges in August 2000); (4) defendants Sweeney, Scott, and Rich for retaliation for falsely filing an IMR against him in May 2001 and sentencing him to the SHU; and (5) defendants Kivett, Smith, and Comstock for retaliation for stealing his legal material in July 2001 is DENIED.

Defendants' motion to dismiss **[25]** all of plaintiff's remaining claims is GRANTED. Furthermore, defendants' motion to transfer venue is hereby GRANTED. The Clerk of this Court is directed forthwith to take all steps necessary to transfer the remainder of this case to the Northern District of New York.

SO ORDERED.

Dated: New York, New York
       March 31, 2006

Richard J. Holwell
United States District Judge

42